## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO: _____

CITY OF MIAMI, a Florida municipal
Corporation,

      Plaintiff,

v.

WELLS FARGO & CO., and WELLS
FARGO BANK, N.A.,            DEMAND FOR JURY TRIAL

      Defendants.

_____/

## COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL FAIR HOUSING ACT

# TABLE OF CONTENTS

**Page**

I.  NATURE OF THE ACTION ................................................................. 1

    A.  Wells Fargo Has Engaged in a Continuing Pattern of Discriminatory Mortgage Lending Practices in Miami Resulting in Foreclosures .......... 1

II.  PARTIES ............................................................................................. 10

III.  JURISDICTION AND VENUE .......................................................... 11

IV.  FACTUAL BACKGROUND ............................................................... 12

    A.  Background Regarding Discriminatory Loan Practices, Reverse Redlining, and Redlining ........................................................................ 12

V.  WELLS FARGO ENGAGED IN DISCRIMINATORY  LENDING PRACTICES ........................................................................................ 15

    A.  Wells Fargo Permits and Promotes Discriminatory Lending ............... 15

        1.  Wells Fargo's mortgage loan channels ........................................ 15

        2.  Product Placement. ...................................................................... 17

        3.  Wholesale mortgage broker fees. ................................................ 22

    B.  Wells Fargo's Conduct Had a Disparate Impact on Minority Borrowers in Violation of the Fair Housing Act ........................................................ 27

        1.  Discriminatory lending results in a disproportionate number of foreclosures in minority areas ...................................................... 27

        2.  Minority neighborhoods are disproportionate recipients of predatory loans ............................................................................ 28

        3.  Statistical analyses conducted by the United States Department of Justice of data for loans originated by Wells Fargo showed a disparate impact on minority borrowers ...................................... 30

            a.  Minority borrowers were more likely than whites to receive subprime loans .................................................................... 30

            b.  Minority borrowers were more likely than white borrowers to pay higher broker fees and costs. .................................... 33

    C.  Wells Fargo Intentionally Discriminated Against Minority Borrowers in Violation of the Fair Housing Act, as Demonstrated by Former Bank Employees ............................................................................................ 35

        1.  Wells Fargo targets minorities for predatory loan terms ............. 36

2.   Wells Fargo gives its employees discretion to steer people who qualify for conventional mortgages into discriminatory mortgages (and pays its employees more for doing so). ..............................37

3.   Wells Fargo underwrites adjustable rate loans that borrowers cannot afford. ...............................................................38

4.   Wells Fargo limits the ability of minority borrowers to refinance out of the same predatory loans that they previously received from the Bank. ............................................................39

5.   Wells Fargo engages in other abusive lending practices............39

D.   Minorities in Fact Receive Predatory Loan Terms from Wells Fargo ..40

E.   Minorities in Miami Receive Such Predatory Loan Terms from Wells Fargo Regardless of Creditworthiness ....................................43

F.   Wells Fargo's Targeting of Minorities who in Fact Receive Predatory Loan Terms Regardless of Creditworthiness Causes Foreclosures.......45

1.   Data shows that Wells Fargo's foreclosures are disproportionately located in minority neighborhoods in Miami. ...........................45

2.   Data shows that Wells Fargo's loans to minorities result in especially quick foreclosures......................................49

3.   Data shows that the discriminatory loan terms cause the foreclosures..................................................................50

VI.   INJURY TO MIAMI CAUSED BY WELLS FARGO'S  DISCRIMINATORY LOAN PRACTICES ...............................................................52

A.   Miami has been Injured by a Reduction in Property Tax Revenues from Foreclosures Caused by Discriminatory Loans Issued by Wells Fargo 52

1.   The decreased value of the properties foreclosed by Wells Fargo result in reduced property tax revenues.....................................53

2.   The decreased value of properties in the neighborhoods surrounding foreclosed properties results in reduced property tax revenues. ......................................................................53

B.   Miami Is Injured Because It Provided and Still Must Provide Costly Municipal Services for Foreclosure Properties in Minority Neighborhoods as a Direct Result of Discriminatory Loans Originated or Purchased by Wells Fargo....................................................55

VII.   SAMPLE FORECLOSURE PROPERTIES IN THE CITY  OF MIAMI.......57

VIII.   STATUTE OF LIMITATIONS AND CONTINUING VIOLATIONS DOCTRINE ...........................................................................58

IX.   CLAIMS FOR RELIEF.............................................................58

FIRST CLAIM FOR RELIEF  (Violation of the Federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*)............................................................................................ 58

SECOND CLAIM FOR RELIEF (Common Law Claim for Unjust Enrichment Based on Florida Law) .................................................................................. 60

DEMAND FOR JURY TRIAL ................................................................................. 61

PRAYER FOR RELIEF ............................................................................................ 61

## I.      NATURE OF THE ACTION

1.      It is axiomatic that banks should not make discriminatory loans.  Banks must extend credit to minorities on equal terms as they do to other similarly situated borrowers.  Banks should not target minority neighborhoods for loans that discriminate nor make loans to minorities on terms that are worse than those offered to whites with similar credit characteristics.  When Banks engage in such discriminatory conduct, the misconduct has profound financial consequences for the cities in which mortgaged properties exist, and Banks should be responsible for those financial consequences.  Banks should reimburse the City for lost tax revenues due to discriminatory lending.  And banks should pay the costs of repairing and maintaining properties that go into foreclosure due to discriminatory lending.  This lawsuit arises because Wells Fargo breached these legally mandated obligations and foreseeably injured the City of Miami.

### A.      Wells Fargo Has Engaged in a Continuing Pattern of Discriminatory Mortgage Lending Practices in Miami Resulting in Foreclosures

2.      This suit is brought pursuant to the Fair Housing Act of 1968 ("FHA"), as amended, 42 U.S.C. §§ 3601, *et seq.*, by the City of Miami ("Miami" or "City") to seek redress for injuries caused by Wells Fargo's[1] ("Wells Fargo" or "the Bank") pattern or practice of illegal and discriminatory mortgage lending.  Specifically, Miami seeks injunctive relief and damages for the injuries caused by foreclosures on Wells Fargo's loans in minority neighborhoods and to minority borrowers that are the result of Wells Fargo's unlawful and discriminatory lending practices.  The unlawful conduct alleged herein consists of both intentional discrimination and disparate impact discrimination.

---

[1] Defendants collectively are referred to as "Wells Fargo," including: Wells Fargo & Co., and Wells Fargo Bank, N.A. Plaintiff alleges that Defendants are also liable for residential home loans and lending operations acquired from, and/or sold by or through, AM Mortgage Network DBA Vertice, American Mortgage, American Mortgage Network, American Mortgage Network DBA Vertice, Wachovia Mortgage, Wachovia Mortgage, FSB, World Savings Bank, and World Savings Bank, FSB.

3.      The State of Florida in general, and the City of Miami in particular, have been devastated by the foreclosure crisis.  As of October 2013, Florida has the country's highest foreclosure rate, and Miami has the highest foreclosure rate among the 20 largest metropolitan statistical areas in the country.[2]  Moreover, Florida is by far the leading state in the country with regard to owner-vacated or "Zombie" foreclosures.[3]

4.      The foreclosure crisis in Florida resulted in such drastic consequences that the Florida Supreme Court established a Task Force to recommend "policies, procedures, strategies, and methods for easing the backlog of pending residential mortgage foreclosure cases while protecting the rights of parties."[4]

5.      Wells Fargo has engaged in a continuous pattern and practice of mortgage discrimination in Miami since at least 2004 by imposing different terms or conditions on a discriminatory and legally prohibited basis.  In order to maximize profits at the expense of the City of Miami and minority borrowers, Wells Fargo adapted its unlawful discrimination to changing market conditions.  This unlawful pattern and practice is continuing through the present and has not terminated. Therefore, the operative statute of limitations governing actions brought pursuant to the Federal Fair Housing Act has not commenced to run.

---

[2] RealtyTrac, *Scheduled Judicial Foreclosure Auctions Increase Annually for 16th Straight Month, Foreclosure  Starts Up Monthly for Second Straight Month, Big Jumps in FL, IL, CO*, (Nov. 14, 2013) (*available at* http://www.realtytrac.com/content/foreclosure-market-report/october-2013-us-foreclosure-market-report-7934).

[3] RealtyTrac, *Q1 2013 Foreclosure Inventory Update*, pg. 5 (*available at* http://www.realtytrac.com/images/reportimages/RealtyTrac_Foreclosure_Inventory_Analysis_Q1_2013.pdf).

[4] Florida Supreme Court Task Force On Residential Mortgage Foreclosure Cases, *Final Report And Recommendations* (August 17, 2009) (*available at* www.floridasupremecourt.org/.../Filed_08-17-2009_Foreclosure_Final_).

6.     The pattern and practice of lending discrimination engaged in by Wells Fargo consists of traditional redlining[5] and reverse redlining,[6] both of which have been deemed to violate the FHA by federal courts throughout the country.  Wells Fargo engaged in redlining, and continues to engage in said conduct, by refusing to extend mortgage credit to minority borrowers in Miami on equal terms as to non-minority borrowers.  Wells Fargo engaged in reverse redlining, and continues to engage in said conduct, by extending mortgage credit on predatory terms to minority borrowers in minority neighborhoods in Miami on the basis of the race, or ethnicity of its residents.  Federal Reserve Chairman Ben Bernanke recently acknowledged these twin evils of mortgage discrimination and explained that both types of mortgage discrimination "continue to have particular significance to mortgage markets."[7]

7.     Major banks such as Wells Fargo have a long history of engaging in redlining throughout Miami.  That practice began to change in the late 1990s, when Wells Fargo adapted to changing market conditions and began to flood historically underserved minority communities with mortgage loans that consisted of a variety of high cost and abusive mortgage loan products with predatory terms as compared to the mortgage loans issued to similarly-situated white borrowers (reverse redlining).

8.     Wells Fargo's discriminatory lending practices have the purpose and effect of placing vulnerable, underserved borrowers in loans they cannot afford.  Reverse redlining maximizes Wells Fargo's profit without regard to the borrower's best interest, the borrower's ability to repay, or the financial health of underserved minority neighborhoods.  Moreover, Wells Fargo has averted any significant risk to

---

[5] Redlining is the practice of denying credit to particular neighborhoods based on race.

[6] Reverse redlining is the practice of flooding a minority community with exploitative loan products.

[7] Remarks by Federal Reserve Chairman Ben Bernanke at the Operation HOPE Global Financial Dignity Summit, Atlanta, Georgia at pg. 10 (November 15, 2012) (*available at* www.federalreserve.gov/newsevents/speech/bernanke20121115a.htm).

itself by selling the vast majority of mortgage loans it originates or purchases on the secondary market (collectively "Wells Fargo Loans").

9.      Between 1996-2006, one category of discriminatory loan products – subprime loans – grew throughout the country from $97 billion to $640 billion.  These loans were frequently targeted to minorities.  Upon information and belief, the lack of accessible credit resulting from Wells Fargo's previous pattern and practice of redlining in the minority communities in Miami created conditions whereby the Bank could easily target and exploit the underserved minority communities who due to traditional redlining had been denied credit.

10.      Thereafter, following several years of issuing abusive, subprime mortgage loans throughout the minority communities of Miami, commencing in or around 2007, Wells Fargo once again adapted to changing market conditions while continuing its pattern and practice of issuing a variety of discriminatory loan products.  Simultaneously, Miami and other communities throughout the country experienced a curtailment of mortgage credit issued to minority borrowers.[8]  Wells Fargo is one of the largest mortgage lenders doing business in Miami and its policies and practices contributed to this problem.  In other words, Wells Fargo not only refused to extend credit to minority borrowers when compared to white borrowers, but when the Bank did extend credit, it did so on predatory terms.  This combination of reverse redlining and redlining represents a continuing and unbroken pattern and practice of mortgage lending discrimination in Miami that still exists today.

11.      Wells Fargo's pattern and practice of *reverse redlining* has caused an excessive and disproportionately high number of foreclosures on the Wells Fargo Loans it has made in the minority neighborhoods of Miami.  Foreclosures on loans

---

[8] Center for Responsible Lending, *The State of Lending in America & its Impact on U.S. Households* (2012) (*available at* http://www.responsiblelending.org/state-of-lending/State-of-Lending-report-1.pdf); Harvard School of Public Health, *Home Purchase Loan Denial Rate By Race/Ethnicity* (2010) (available at http://diversity data.sph.harvard.edu/Data/Rankings/Show.aspx?ind=9).

originated by Wells Fargo are concentrated in these neighborhoods. *A loan in a predominantly minority neighborhood is 6.975 times more likely to result in foreclosure than is a loan in a neighborhood with a majority of white residents*.

12.     Wells Fargo's pattern and practice of *traditional redlining* has also caused an excessive and disproportionately high number of foreclosures in the minority neighborhoods of Miami.  These foreclosures often occur when a minority borrower who previously received a predatory loan sought to refinance the loan, only to discover that Wells Fargo refused to extend credit at all, or on equal terms as refinancing similar loans issued to white borrowers.  The inevitable result of the combination of issuing a predatory loan, and then refusing to refinance the loan, was foreclosure.

13.     Wells Fargo would have had comparable foreclosure rates in minority and white communities if it was properly and uniformly applying responsible underwriting practices in both areas.  Wells Fargo possesses sophisticated underwriting technology and data that allows it to predict with precision the likelihood of delinquency, default or foreclosure.  The fact that Wells Fargo's foreclosures are so disproportionately concentrated in minority neighborhoods is not the product of random events.  To the contrary, it reflects and is fully consistent with Wells Fargo's practice of targeting minority neighborhoods and customers for discriminatory practices and predatory pricing and products.  It also reflects and is consistent with Wells Fargo's practice of failing to underwrite minority borrowers' applications properly and of putting these borrowers into loans which (1) have more onerous terms than loans given to similarly situated white borrowers and (2) the borrowers cannot afford, leading to foreclosures.

14.     The Bank's predatory and discriminatory lending practices are evidenced by information from confidential witness statements provided by former employees of Wells Fargo (discussed further herein).  For example:

(a)     Manager of Bank's subprime unit that targeted African-Americans told witness that she was "too white" to appear before the audience at a seminar.

(b)     "If a guy told you he made $3000, you'd put in $5000" into the underwriting software program. There was no "backstop" system at the Bank to prevent it.  Loan officers were "putting people in homes that they didn't qualify for. Obviously, it would put them in a bad predicament."

(c)     After the market crashed in or around 2008, "[m]inorities had a harder time verifying the documentation."

(d)     "I always said that a Rodriguez in the last name was treated differently than a Smith. . .[T]he one with Smith would get [the loan] and the one with Rodriguez wouldn't."

(e)     "It was common knowledge that, to avoid problems, loans from one office were sent to another office to make both look more balanced.  We needed to put some white loans in that community and some black loans in this community because [otherwise] we'll get some sh#% from the Fed."

15.    The reports of these witnesses are confirmed when the Miami data on Wells Fargo loans is examined.  Such an examination reveals a widespread practice of discrimination.  For example, a regression analysis that controls for credit history and other factors demonstrates that an African-American Wells Fargo borrower was 4.321 times more likely to receive a predatory loan as a white borrower and a Latino borrower 1.576 times more likely.  The regression analysis confirms that African-Americans with FICO scores over 660 are 2.572 times more likely to receive a predatory Wells Fargo loan as a white borrower, and a Latino borrower 1.875 times more likely.

16.    To date, successful discriminatory lending actions alleging conduct similar to that alleged herein have been brought against Wells Fargo by the City of Baltimore, the City of Memphis, the Department of Justice, and the Federal Reserve Bank.  The Federal Reserve levied an $85 million penalty against Wells Fargo,

representing the largest penalty it has assessed in a consumer protection enforcement action.

17.     The Department of Justice's Civil Rights Division determined that mortgage brokers who generated loan applications through Wells Fargo's wholesale channel, and were granted broad pricing discretion by Wells Fargo, had charged higher fees and rates to tens of thousands of minority borrowers across the country than they had to white borrowers who posed the same credit risk – selling what Wells Fargo employees in Baltimore referred to as "ghetto loans."

18.     The past several years have been highly profitable for Wells Fargo. According to a January 11, 2013, press release, the Bank generated a record amount of (i) net income ($18.9 billion) and (ii) diluted earnings per share ($3.36).  The following charts illustrate these results.

Net Income (millions)



Earnings per share



19.    The $19 billion that the Bank reported as profit in 2012 is more than double the annual profit that it reported during the boom years of 2003-2007.  During the crisis years of 2009-2012, Wells Fargo reported a combined $59 billion in profits, while millions lost their homes.

20.    At the same time that Wells Fargo achieved record financial success, the Bank's discriminatory practices and resulting foreclosures in the City's minority neighborhoods have inflicted significant, direct, and continuing financial harm to the City.  Since 2008, banks have foreclosed on approximately 1.8 million  homes in Florida, and Wells Fargo is responsible for a significant number  of these foreclosures.

21.    In this action the City seeks damages due to reduced property tax revenues based on (a) the decreased value of the vacant properties themselves, and (b) the decreased value of properties surrounding the vacant properties.  In addition, the City seeks damages based on the expenditure of municipal services that will be required to remedy the blight and unsafe and dangerous conditions which exist at vacant properties that were foreclosed as a result of Wells Fargo's illegal lending practices.

22.     Because of the multitude of analytic tools available to Wells Fargo to determine the likelihood that a particular mortgage loan would result in default by the borrower, as well as the existence of various studies, reports, and other pertinent literature specifically addressing the connection between mortgage loans and foreclosures, it was foreseeable that Wells Fargo knew, or should have known, that a predatory or high risk loan issued to an African-American or Hispanic in certain neighborhoods in Miami would result in default and subsequent foreclosure.  Moreover, because Wells Fargo maintains numerous branch offices throughout Miami and has knowledge of the specific address for each loan it issued, it was foreseeable that Wells Fargo knew, or should have known of the condition of foreclosed properties corresponding to loans that it issued in Miami regardless of whether it serviced the loan or subsequently sold the servicing rights to a third party.

23.     According to Federal Reserve Chairman Bernanke, "foreclosures can inflict economic damage beyond the personal suffering and dislocation that accompany them.  Foreclosed properties that sit vacant for months (or years) often deteriorate from neglect, adversely affecting not only the value of the individual property but the values of nearby homes as well.  Concentrations of foreclosures have been shown to do serious damage to neighborhoods and communities, reducing tax bases and leading to increased vandalism and crime.  Thus, the overall effect of the foreclosure wave, especially when concentrated in lower-income and minority areas, is broader than its effects on individual homeowners."[9]

24.     The discriminatory lending practices at issue herein have resulted in what many leading commentators describe as the "greatest loss of wealth for people of color in modern US history."  It is well-established that poverty and unemployment rates for minorities exceed those of whites, and therefore, home equity represents a

---

[9] Bernanke, *supra* n.7 at p. 4.

disproportionately high percentage of the overall wealth for minorities.[10]  As Federal Reserve Chairman Bernanke recently explained, as a result of the housing crisis, "most or all of the hard-won gains in homeownership made by low-income and minority communities in the past 15 years or so have been reversed."[11]  The resulting impact of these practices represents "nothing short of the preeminent civil rights issue of our time, erasing, as it has, a generation of hard fought wealth accumulation among African-Americans."[12]

## II.   PARTIES

25.    Plaintiff City of Miami is a Florida municipal corporation..  The City is authorized by the City Commission to institute suit to recover damages suffered by the City as described herein.

26.    Wells Fargo & Company is a nationwide, diversified, financial services company.  Upon information and belief, its corporate headquarters are located in San Francisco, California.  It is the parent company of Wells Fargo Bank, N.A.

27.    Wells Fargo Bank, N.A. is organized as a national banking association under the laws of the United States.  Upon information and belief, its corporate headquarters are located in South Dakota.  It maintains multiple offices in the State of Florida for the purposes of soliciting applications for and making residential mortgage loans and engaging in other business activities.

28.    The Defendants in this action are, or were at all relevant times, subject to Federal laws governing fair lending, including the FHA and the regulations promulgated under each of those laws.  The FHA prohibits financial institutions from

---

[10] Robert Schwemm and Jeffrey Taren, *Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act,* 45 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REV. 375, 382 (2010).

[11] Bernanke, *supra* n.7 at p. 3.

[12] Charles Nier III and Maureen St. Cyr, *A Racial Financial Crisis: Rethinking the Theory of Reverse Redlining to Combat Predatory Lending Under the Fair Housing Act*, 83 TEMPLE LAW REVIEW 941, 942 (2011).

discriminating on the basis of, *inter alia*, race, color, or national origin in their residential real estate-related lending transactions.

29.    The Defendants in this action are or were businesses that engage in residential real estate-related transactions in the City of Miami within the meaning of the FHA, 42 U.S.C. § 3605.

30.    Based on information reported pursuant to the Home Mortgage Disclosure Act, in addition to loans that Defendants originated directly, Defendants are responsible for residential home loans acquired from, and/or sold by or through, Wells Fargo Financial, Wells Fargo Funding, Inc., Wachovia Mortgage, FSB, Wachovia Bank, N.A., Wachovia Mortgage Co., World Savings Bank, FSB, American Mortgage Network, Inc., and Home Services Lending, LLC.

31.    Upon information and belief, Plaintiff alleges that each of the Defendants was and is an agent of the other Defendants.  Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting in the course and scope of its actual or apparent authority pursuant to such agencies, and/or the alleged acts or omissions of each Defendant as agent were subsequently ratified and adopted by each agent as principal.  Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting through its agents, and is liable on the basis of the acts and omissions of its agents.

### III.    JURISDICTION AND VENUE

32.    This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 3613 and 28 U.S.C. §§ 1331, 1343, because the claims alleged herein arise under the laws of the United States.

33.    Venue is proper in this district under 28 U.S.C. § 1391(b) because Wells Fargo conducts business in this district and a substantial part of the events and omissions giving rise to the claims occurred in this district.

## IV.   FACTUAL BACKGROUND

### A.   Background Regarding Discriminatory Loan Practices, Reverse Redlining, and Redlining

34.   Prior to the emergence of subprime lending, most mortgage lenders made only "prime" loans.  Prime lending offered uniformly priced loans to borrowers with good credit, but individuals with lower credit were not eligible for prime loans.

35.   Subprime lending developed and began growing rapidly in the mid-1990s as a result of technological innovations in risk-based pricing and in response to the demand for credit by borrowers who were denied prime credit by traditional lenders.  Advances in automated underwriting allowed lenders to predict with improved accuracy the likelihood that a borrower with lower credit will successfully repay a loan.  These innovations gave lenders the ability to adjust the price of loans to match the different risks presented by borrowers whose credit records did not meet prime standards.  Lenders found that they could now accurately price loans to reflect the risks presented by a particular borrower.  When done responsibly, this made credit available much more broadly than had been the case with prime lending.

36.   Responsible subprime lending has opened the door to home ownership to many people, especially low- to moderate-income and minority consumers, who otherwise would have been denied mortgages.  At the same time, however, subprime lending has created opportunities for unscrupulous lenders to target minorities and engage in discriminatory, irresponsible lending practices that result in loans that borrowers cannot afford.  This, in turn, leads directly to defaults and foreclosures.

37.   Enticed by the prospect of profits resulting from exorbitant origination fees, points, and related pricing schemes, some irresponsible lenders took advantage of a rapidly rising real estate market to convince borrowers to enter into discriminatory loans that had unfair terms that they could not afford.  Often this was accomplished with the help of deceptive practices and promises to refinance at a later date.  These abusive lenders did not worry about the consequences of default or foreclosure to their

business because, once made, a significant amount of the loans were sold on the secondary market.

38.     As the subprime market grew, the opportunities for abusive practices grew with it.[13]  As a consequence, the federal government has found that abusive and predatory practices "are concentrated in the  subprime mortgage market."[14]  These practices, which in recent years have become the target of prosecutors, legislators, and regulators, include the following:

   a.     Placing borrowers in subprime loans even though they qualify for prime loans on better terms.

   b.     Failing to prudently underwrite hybrid adjustable rate mortgages (ARMs), such as 2/28s and 3/27s.[15]  After the borrower pays a low "teaser rate" for the first two or three years, the interest rate on these loans resets to a much higher rate that can continue to rise based on market conditions.  Subprime lenders often underwrite these loans based only on consideration of whether the borrower can make payments during the initial teaser rate period, without regard to the sharply higher payments that will be required for the remainder of a loan's 30-year term.  Irresponsible lenders aggressively market the low monthly payment that the borrower will pay during the teaser rate period, misleading borrowers into believing that they can afford that same

---

[13] United States Department of Housing and Urban Development Office of Policy Development and Research, Report to Congress on the Root Causes of the Foreclosure Crisis, (2010) at 52 ("While many factors have undoubtedly contributed to the recent rise in foreclosures, as discussed earlier, no small part of the increase stems from recent increases in abusive forms of subprime lending") (*available at* http://www.huduser.org/portal/Publications/PDF/Foreclosure_09.pdf).

[14] United States Department of Housing & Urban Development and United States Department of the Treasury, Curbing Predatory Home Mortgage Lending (2000) at 1 (*available at* http://www.huduser.org/Publications/pdf/treasrpt.pdf) ("HUD/Treasury Report").

[15] In a 2/28 ARM, the "2" represents the number of years the mortgage will be fixed over the term of the loan, while the "28" represents the number of years the interest rate paid on the mortgage will be variable.  Similarly, in a 3/27 ARM, the interest rate is fixed for three years and variable for the remaining 27-year amortization.

low monthly payment for the entire 30-year term of the loan, or that they can refinance their loan before the teaser rate period expires.

        c.      Failing to prudently underwrite refinance loans, where borrowers substitute unaffordable mortgage loans for existing mortgages that they are well-suited for and that allow them to build equity.  Such refinanced loans strip much or even all of that equity by charging substantial new fees, often hiding the fact that the high settlement costs of the new loan are also being financed.  Lenders that aggressively market the ability of the borrower to pay off existing credit card and other debts by refinancing all of their debt into one mortgage loan mislead borrowers into believing that there is a benefit to debt consolidation, while obscuring the predictable fact that the borrower will not be able to repay the new loan.  The refinanced loans are themselves often refinanced repeatedly with ever-increasing fees and higher interest rates, and with ever-decreasing equity, as borrowers seek to stave off foreclosure.

        d.      Allowing mortgage brokers to charge "yield spread premiums" for qualifying a borrower for an interest rate that is higher than the rate the borrower qualifies for and can actually afford.

        e.      Failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history.  These criteria ensure that a borrower is obtaining a loan that he or she has the resources and assets to repay, and ignoring these criteria results in many loans that bear no relation to borrowers' ability to repay them.  This allows the lender to make a quick profit from the origination, but sets the borrower up for default and foreclosure.

        f.      Requiring substantial prepayment penalties that prevent borrowers whose credit has improved from refinancing their subprime loan to a prime loan. Prepayment penalties not only preclude borrowers from refinancing to a more affordable loan, but reduce the borrowers' equity when a subprime lender convinces borrowers to needlessly refinance one subprime loan with another.

g.    Charging excessive points and fees that are not associated with any increased benefits for the borrower.

39.    The problem of predatory practices in subprime mortgage lending is particularly acute in minority communities because of "reverse redlining."  As used by Congress and the courts, the term "reverse redlining" refers to the practice of targeting residents in certain geographic areas for credit on unfair terms due to the racial or ethnic composition of the area.  This is in contrast to "redlining," which is the practice of denying *equal* credit opportunities to specific geographic areas because of the racial or ethnic composition of the area.  Both practices have repeatedly been held to violate the Federal Fair Housing Act.

40.    Following the onset of the subprime mortgage crisis, and after years of issuing abusive home loans in minority neighborhoods, the big bank lenders began to limit the issuance of mortgage credit to minority borrowers (*i.e.*, refusing to refinance predatory loans).  At the same time, when the big banks did extend credit, they continued to do so on predatory terms.

## V.    WELLS FARGO ENGAGED IN DISCRIMINATORY LENDING PRACTICES

### A.    Wells Fargo Permits and Promotes Discriminatory Lending

#### 1.    Wells Fargo's mortgage loan channels.

41.    Between 2004 and at least 2008, Wells Fargo originated retail residential home mortgage loans and purchased loans in numerous geographic markets in the United States, including several hundred metropolitan areas ("MSAs"), and specifically, the Miami MSA.

42.    During all or part of this time period, Wells Fargo Home Mortgage was divided into two major divisions – Retail (National Consumer Lending) and Institutional Lending ("IL"), of which Wells Fargo Wholesale Lending was a business line.  Within the retail channel, Wells Fargo had "Distributed Retail" and "Centralized Retail" lines.  The Distributed Retail line operated as a traditional retail channel that

had face-to-face contact with customers in branch offices and originated both prime and subprime loans.  The subprime division of the Distributed Retail line was known as the Mortgage Resources ("MoRe") division; in early 2005, its name was changed to Home Credit Solutions ("HCS").  Loan officers within the Distributed Retail line were assigned to either the prime or MoRe/HCS divisions.  Until the two divisions were merged in 2008, no retail loan officer originated both prime and subprime loans.  The Centralized Retail line primarily handled prime loan products and operated through telephone calls and internet applications.  Wells Fargo referred to both prime and subprime loan officers in its Distributed Retail and Centralized Retail lines as "Home Mortgage Consultants" or "HMCs."  The same prime pricing policies applied to both the Centralized and Distributed Retail lines.

43.     Through its retail and wholesale channels, Wells Fargo originated virtually every type of loan product that was available in the residential lending market.  Among others, these products included:  (a) traditional prime loans (least risky); (b) subprime loans (most risky) typically designed for borrowers with credit scores or other credit characteristics deemed too weak to qualify for prime loans; and (c) "Alt-A" loans (risk level between prime and subprime loans) with application requirements or payment terms less restrictive than traditional prime loan terms or requirements, such as interest-only terms, reduced documentation requirements, or balloon payments.  Subsequent to origination, Wells Fargo sold or securitized for sale the bulk of the loans it originated in the secondary market, either to government-sponsored entities Fannie Mae and Freddie Mac or to private investors.

44.     Since 2008, as the data discussed below makes clear, there has been a shift in the types of loans issued – and not issued – by the Bank.  For example, the Bank shifted from offering new subprime loans toward issuing more Home Equity Lines of Credit ("HELOCs") and higher cost loans including, but not limited to,

FHA/VA loans.[16]  FHA and VA government loans are characterized as higher risk loans because (1) they are typically more expensive for a borrower than conventional loans and include fees and costs not associated with conventional loans, and (2) several of the government loan programs permit negative amortization.[17]  At the same time, in the last several years, the Bank tightened lending requirements in a manner that drastically limited the ability of minority borrowers to refinance or otherwise modify the subprime loans previously issued by the Bank.

45.    Wells Fargo applied its pricing policies on a nationwide basis, though the rate sheets followed certain state-specific requirements.

**2.    Product Placement.**

46.    Wells Fargo placed African-American and Hispanic borrowers into predatory loans (*e.g.*, subprime, burdensome HELOCs, more onerous/expensive terms, higher costs, etc.) even though white borrowers who had similar credit qualifications were placed into prime loans.  As a result of being placed into an illegal discriminatory loan, an African-American or Hispanic borrower paid, on average, up to tens of thousands of dollars more for a Wells Fargo loan, and was subject to possible pre-payment penalties, increased risk or credit problems, default, and foreclosure, as well as the emotional distress that accompanies such economic pressures.  It was Wells Fargo's business practice to allow its HMCs and mortgage brokers to place an applicant in a discriminatory loan even when the applicant qualified for a prime loan according to Wells Fargo's underwriting guidelines.  Wells Fargo also gave its HMC's and mortgage brokers originating Wells Fargo loans discretion to request and grant exceptions to underwriting guidelines.  These policies

---

[16] While FHA/VA loans are not inherently predatory, these loans have higher risk features such as higher fees and higher interest rates.  When banks target minorities for FHA/VA loans and issue more of them to minorities, they are acting in a discriminatory manner.

[17]  California Reinvestment Coalition, et al., *Paying More for the American Dream VI, Racial Disparities in FHA/VA Lending,* (July 2012); www.fha.com/fha_loan_types; www.benefits.va.gov/homeloans.

and practices resulted in the placement of African-American and Hispanic borrowers into predatory loans, when similarly-situated white borrowers were placed into prime loans, both on a nationwide basis and in dozens of geographic markets across the country (including Miami) where Wells Fargo originated a large volume of loans.

47.   Wells Fargo's fair lending monitoring efforts were sufficient to put it on notice of widespread product placement disparities based on race and national origin. Wells Fargo did not act to determine the full scope of these product placement disparities, nor did it take prompt and effective action to eliminate those disparities. As described in further detail below, at certain times relevant to this action, Wells Fargo had in place a system, called the "A-Paper Filter" or the "Enhanced Care Filter," whose stated purpose was ensuring that all prime-eligible borrowers were referred to the Bank's prime division.  The A-Paper Filter was highly susceptible to manipulation because individual non-prime loan originators were responsible for entering a borrower's information into the Filter.  Further, internal Wells Fargo officers indicate that senior Wells Fargo officers were aware that the Bank's compensation structure incentivized loan originators to manipulate the data they entered into the A-Paper Filter in order to keep prime-eligible borrowers within the subprime division.  Senior Wells Fargo officers were aware that this manipulation was in fact occurring on a systematic basis, but failed to take appropriate corrective action.

48.   Wells Fargo published underwriting guidelines that purported to establish the objective criteria an applicant had to meet in order to qualify for a particular type of loan product.  These underwriting guidelines were available to Wells Fargo's underwriters, as well as its third-party loan originators who had entered into contracts with Wells Fargo to enable them to select loan products for individual borrowers with differing credit-related characteristics (*i.e.*, purchases made via Wells Fargo's wholesale channel).  These underwriting guidelines were intended to be used, for example, to determine whether a loan applicant qualified for a prime loan product, a

referral from the prime division to the subprime division, a subprime loan product, referral to an FHA/VA loan or other special loan product, or for no Wells Fargo loan product at all.

49.     Loan terms and conditions, including prices, generally are most favorable for a borrower with a prime loan product, and least favorable for a borrower with a subprime loan product, which often included terms such as initial short-term teaser interest rates that suddenly rise to produce substantially increased and potentially unaffordable payments after two to three years, substantial pre-payment penalties, balloon payments, higher fees, and longer underwriting times.

50.     In mortgage lending commission structures, loan officers typically receive commissions in terms of "basis points," with one basis point being equivalent to 0.01% of the loan amount.  From 2004 to 2005, for example, Wells Fargo's subprime HMCs earned between 95 and 180 basis points, depending on loan amount and monthly origination volume, for originating a subprime loan.  From 2006 to 2007, subprime HMCs earned between 75 and 175 basis points, depending on loan amount and monthly origination volume, for originating a subprime loan.  From 2004 to 2007, a subprime HMC earned only 50 basis points for referring a prime-eligible borrower to the prime division.  Accordingly, a subprime HMC lost between 25 and 130 basis points for referring a prime-eligible borrower to the prime division rather than originating the loan as subprime.  This policy and practice created a financial incentive for HMCs to originate loans as subprime rather than prime, even when the applicant could have qualified for a prime loan.

51.     Wells Fargo's cap on the amount of total compensation that a mortgage broker could receive on an individual loan also varied, in part, based on whether the loan was a subprime product or a prime product.  From 2004 through at least 2007, total broker compensation for prime loans was capped at 4.5% (450 basis points) of the loan amount.  However, total broker compensation for subprime loans was capped

at 500 basis points, giving brokers a financial incentive to originate a subprime loan where possible.  The higher cap means, for example, that a broker originating a $300,000 loan could make $1,500 more by originating the loan as subprime rather than prime.

52.     Wells Fargo's compensation structure provided a strong incentive for HMCs and wholesale mortgage brokers to originate a loan, as subprime, even if the borrower could qualify for a more favorable prime loan.  This compensation structure, combined with the substantial discretion that subprime loan originators had to qualify prime-eligible borrowers for subprime loans, resulted in discrimination on the basis of race and national origin against African-American and Hispanic borrowers.

53.     For each residential loan that Wells Fargo's HMCs and mortgage brokers originated from at least 2004, information about each borrower's race and national origin was known by or available to Wells Fargo.

54.     Subprime loan originators had the ability to enter incorrect information into the A-Paper Filter to prevent a borrower from being identified as prime-eligible, thereby ensuring that the loan would remain in the subprime division.  The incorrect information included, but was not limited to:  (1) stating a reduced income in order to make a borrower's debt-to-income ratio ("DTI") appear higher than it actually was; (2) omitting assets to create the appearance that a borrower had no reserves; and (3) misstating the borrower's length of employment.  The A-Paper Filter was not capable of identifying situations wherein information was entered into the Filter incorrectly for purposes of ensuring that a loan could remain in the subprime channel.

55.     Subprime loan originators were not prohibited from encouraging prime-eligible borrowers to take steps that would disqualify them from receiving prime loans, including, but not limited to, the following:  (1) encouraging borrowers to forego providing income and/or asset documentation; and (2) encouraging borrowers to take out additional cash or forego making a down payment, thereby increasing the

borrower's loan-to-value ratio ("LTV").  Internal Wells Fargo documents indicate that Wells Fargo senior managers were aware that loan originators were encouraging borrowers to take these and other steps adverse to borrowers' interests on a systematic basis.  Notably, the A-Paper Filter was not able to identify situations wherein prime-eligible borrowers were encouraged by loan originators to take steps that would disqualify them from receiving prime loans.

56.    Internal Wells Fargo audits of the A-Paper Filter identified multiple problems.  These audits indicated that data inputted into the Filter was often inconsistent with the information contained in the loan files, and that many loans were originated as subprime although no subprime qualifiers existed in the loan files.

57.    For each subprime loan that had a prepayment penalty, an interest-only feature, or reduced documentation, Wells Fargo required borrowers to sign a disclosure form, called the "Product/Feature Selection Disclosure."  This form purported to explain how these features impacted the borrower's financing and to explain that the borrower was receiving a subprime loan, and required the borrower to confirm that a Wells Fargo loan originator had discussed all available Wells Fargo home mortgage options with the borrower.

58.    This disclosure form was not effective in preventing loan originators from steering borrowers to the subprime division.  Wells Fargo subprime loan originators often failed to discuss all available loan options with borrowers before having them sign the disclosure form.  Further, Wells Fargo subprime loan originators were not required to inform prime-eligible customers who received a subprime loan that they did in fact qualify for a more favorable loan.  Rather, Wells Fargo required all subprime borrowers to sign the Product/Feature Selection Disclosure, without specific knowledge as to whether they were in fact prime-eligible.

### 3.      Wholesale mortgage broker fees.

59.      Wells Fargo charged African-American wholesale borrowers higher fees and costs than white borrowers, not based on their creditworthiness or other objective criteria related to borrower risk, but because of their race.  Similarly, Wells Fargo charged Hispanic wholesale borrowers higher fees and costs than white borrowers, not based on their creditworthiness or other objective criteria related to borrower risk, but because of their national origin.  It was Wells Fargo's business practice to allow its mortgage brokers who generated loan applications through its wholesale channel to vary a loan's interest rate and other fees from the price set based on a borrower's objective credit-related factors.  This unguided and subjective pricing discretion resulted in African-American and Hispanic borrowers paying more than white borrowers with similar credit characteristics.

60.      Wells Fargo's wholesale pricing monitoring efforts, while inadequate to remedy discriminatory practices against African-American and Hispanic borrowers, were sufficient to put it on notice of widespread pricing disparities based on race and national origin.  Even when Wells Fargo had reason to know there were disparities, however, Wells Fargo did not act to determine the full scope of these wholesale pricing disparities, nor did it take prompt and effective action to eliminate those disparities.

61.      From at least 2004, Wells Fargo originated and funded residential loans of all types through its Wholesale Lending Division ("WLD").  Applications for these loans were brought to Wells Fargo by mortgage brokers throughout the United States who entered into contracts with Wells Fargo for the purpose of bringing loan applications to it for origination and funding.

62.      Wells Fargo required prospective brokers to submit a document entitled "Intent to Act as a Broker," and to enter into a Broker Origination Agreement in order to be approved as a Wells Fargo broker.  According to Wells Fargo, the process of

obtaining and maintaining approved broker status involved its careful analysis of the broker's financial condition; experience level; operational scope and operational methodology; and thorough consideration of the broker's organization, staff, organization principals, licensing, agency standing, and regulatory approvals based upon documents and information provided by the broker.

63.    Wells Fargo's brokers were required to adhere to the provisions set forth in its Wholesale Lending Broker Origination Guide, and Wells Fargo's contracts with brokers required representations and warranties that they would comply with applicable federal, state, and local laws and regulations, including fair lending requirements.  Wells Fargo required its brokers to attest that all mortgage loans submitted conformed to the Bank's applicable requirements and to all of the guidelines for a particular loan program.

64.    Wells Fargo authorized brokers to inform prospective borrowers of the terms and conditions under which a Wells Fargo residential loan product was available.  Wells Fargo did not require the mortgage brokers to inform a prospective borrower of all available loan products for which he or she qualified, of the lowest interest rates and fees for a specific loan product, or of specific loan products best designed to serve the interests expressed by the applicant.  Upon receipt of a completed loan application from a broker, Wells Fargo evaluated the proposed loan using its underwriting guidelines and determined whether to originate and fund the loan.

65.    Wells Fargo was directly and extensively involved in setting the complete, final terms and conditions of wholesale loan applications generated by mortgage brokers that Wells Fargo approved and originated.  At the time of originating each loan, Wells Fargo was fully informed of the loan terms and conditions, including the fees it passed along to brokers, and it incorporated those terms and conditions into the wholesale loans it originated.

66.     From at least 2004, Wells Fargo's policies and practices established a two-step process for the pricing of wholesale loans that it originated.  The first step was to establish a base or par rate for a particular type of loan for an applicant with specified credit risk characteristics.  In this step, Wells Fargo accounted for numerous objective credit-related characteristics of applicants by setting a variety of prices for each of the different loan products that reflected its assessment of individual applicant creditworthiness, as well as the current market rate of interest and price it could obtain for the sale of such a loan from investors.

67.     From at least 2004, Wells Fargo set terms and conditions, including interest rates, for its various home mortgage loan products available through its wholesale loan channel.  Wells Fargo accounted for numerous applicant credit risk characteristics by setting a range of prices for each of the different loan products it offered that reflected applicant creditworthiness.  It communicated these loan product prices to its brokers through rate sheets.  Wells Fargo made prime rate sheets available to brokers on a daily basis via email or the "Brokers First" website that communicated the effective date, time, and product pricing that was released with a specific price change.  The rate sheets also established price caps that limited the level of broker compensation.  According to Wells Fargo's Wholesale Pricing Policy, price changes were initiated by Wells Fargo's Capital Markets Group as a result of rate movements, or by the Wholesale Pricing Group to adjust profit expectations or alter competitive position.  Wells Fargo distributed its Traditional Nonprime rate sheets once a week.

68.     Wells Fargo's second step of pricing wholesale loans permitted mortgage brokers to set the amount of broker fees charged to individual borrowers, unrelated to an applicant's credit risk characteristics.  Mortgage brokers who supplied Wells Fargo with loan applications that Wells Fargo funded were compensated in two ways.  One was through a yield spread premium ("YSP"), an amount paid by Wells Fargo to the brokers based on the extent to which the interest rate charged on a loan exceeded the

base or par rate for that loan to a borrower with particular credit risk characteristics fixed by Wells Fargo and listed on its rate sheets.  The YSP is derived from the present dollar value of the difference between the credit risk-determined par interest rate a wholesale lender such as Wells Fargo would have accepted on a particular loan and the interest rate a mortgage broker actually obtained for Wells Fargo.  Wells Fargo benefitted financially from the loans it made at interest rates above the par rates set by its rate sheets.  For those loans that it sold or securitized, higher interest rates meant sales at prices higher than it otherwise would have obtained; for loans it retained, higher interest rates meant more interest income over time.  The second way brokers were compensated was through direct fees and origination fees charged to the borrower.  Wells Fargo directed its closing agents to pay direct fees to brokers out of borrowers' funds at the loan closing.  Taken together, these two forms of compensation are referred to in this Complaint as "total broker fees."

69.     Wells Fargo had written policies placing a ceiling on total broker fees. From 2004 through at least 2009, the maximum total broker fee that a broker could earn from originating a prime Wells Fargo loan was 4.5% of the total loan amount. From 2004 through 2007, the maximum total broker fee that a broker could earn from originating a subprime Wells Fargo loan was 5.0% of the total loan amount.  Wells Fargo stopped originating subprime loans from its wholesale channel in July 2007. Wells Fargo *also* permitted pricing exceptions for reasons wholly unrelated to creditworthiness, such as customer service issues or competitive reasons, and required approval based on the amount of the exception (*e.g.*, exceptions over $2,000 required Vice President approval).

70.     According to Wells Fargo's stated policy, screening for broker compensation caps was automated within the origination system to prevent users from generating closing documents if broker compensation exceeded the caps.  Wells Fargo maintained this pricing policy through at least April 2009.

71.     Other than these caps, Wells Fargo did not establish any objective criteria, or provide guidelines, instructions, or procedures to be followed by brokers (a) in setting the amount of direct fees they should charge or (b) in determining to charge an interest rate for a loan above that set by its rate sheet, which in turn determined the amount of YSP that Wells Fargo would pay the broker.  Mortgage brokers exercised this pricing discretion that Wells Fargo gave them untethered to any objective credit characteristics, on every loan they brought to Wells Fargo for origination and funding.  Wells Fargo affirmed or ratified these discretionary pricing decisions for all the brokered loans it originated and funded.

72.     From 2004 to at least 2009, Wells Fargo was fully informed of all broker fees to be charged with respect to each individual residential loan application presented to it.  Wells Fargo also required brokers to disclose to the borrower all compensation and all other fees expected to be received by the broker in connection with the mortgage loan.  Wells Fargo required brokers to disclose their fees on the Good Faith Estimate, the HUD-1, and other disclosures as applicable.  Total broker fees raised the annual percentage rate charged on a loan, and could increase the note interest rate and the total amount borrowed.

73.     For each residential loan application obtained by mortgage brokers and subsequently funded by Wells Fargo, information about each borrower's race and national origin and the amount and types of broker fees paid was available to and was known by Wells Fargo.  Wells Fargo was required to collect, maintain, and report data with respect to certain loan terms and borrower information for residential loans, including the race and national origin of each wholesale residential loan borrower, pursuant to HDMA.  12 U.S.C. § 2803.

**B.     Wells Fargo's Conduct Had a Disparate Impact on Minority Borrowers in Violation of the Fair Housing Act**

     **1.     Discriminatory lending results in a disproportionate number of foreclosures in minority areas.**

74.     Foreclosures are on the rise in many of the nation's most vulnerable neighborhoods, particularly those with substantial concentrations of minority households.  The increase appears to stem from the presence of (1) subprime lending in these communities and (2) continuing discriminatory lending practices (*e.g.*, steering minorities into loan products with more onerous terms).

75.     A seminal report on foreclosure activity by Mark Duda and William Apgar documents the negative impact that rising foreclosures have on low-income and low-wealth minority communities, using Chicago as a case study.  Mr. Apgar is a Senior Scholar at the Joint Center for Housing Studies of Harvard University, and a Lecturer on Public Policy at Harvard's John F. Kennedy School of Government.  He previously served as the Assistant Secretary for Housing/Federal Housing Commissioner at the U.S. Department of Housing and Urban Development, and also Chaired the Federal Housing Finance Board. Mr. Apgar holds a Ph.D. in Economics from Harvard University.  Mr. Duda is a Research Fellow at the Joint Center for Housing Studies.  The Apgar-Duda report has continually been cited by subsequent governmental, public sector, and private sector reports due to its clarity and thoroughness with respect to the negative impact foreclosures have on lower-income and minority neighborhoods.[18]

76.     This significant report highlights the foreseeability of foreclosures arising from predatory lending practices and their attendant harm, demonstrating that such foreclosures impose significant and predictable costs on borrowers, municipal governments, and neighboring homeowners.

_____
[18] *See* W. Apgar, M. Duda & R. Gorey, *The Municipal Costs of Foreclosures:  A Chicago Case Study* (2005) (*available at* http://www.nw.org/network/neighborworksProgs/foreclosuresolutions/documents/2005 Apgar-DudaStudy- FullVersion.pdf).

77.     Another report, by the Center for Responsible Lending, uses a national dataset to show that the foreclosure rate for low- and moderate-income African-Americans is approximately 1.8 times higher than it is for low- and moderate-income non-Hispanic whites.  The gap is smaller for Latinos, especially among low-income households, but even among low-income Latinos the foreclosure rate is 1.2 times that of low-income whites.  Racial and ethnic disparities in foreclosure rates cannot be explained by income, since disparities persist even among higher-income groups.  For example:  approximately 10 percent of higher-income African-American borrowers and 15 percent of higher-income Latino borrowers have lost their home to foreclosure, compared with 4.6 percent of higher income non-Hispanic white borrowers.  Overall, low- and moderate-income African-Americans and middle- and higher-income Latinos have experienced the highest foreclosure rates.[19]

78.     Nearly 20 percent of loans in high-minority neighborhoods have been foreclosed upon or are seriously delinquent, with significant implications for the long-term economic viability of these communities.[20]

## 2.     Minority neighborhoods are disproportionate recipients of predatory loans.

79.     There is a substantial body of empirical evidence demonstrating the prevalence of reverse redlining in the subprime mortgage market.  These studies show that, even after controlling for creditworthiness and other legitimate underwriting factors, subprime loans and the predatory practices often associated with subprime lending are disproportionately targeted at minority neighborhoods.[21]

---

[19] Center for Responsible Lending, *Lost Ground, 2011:  Disparities in Mortgage Lending and Foreclosures* (2011) (*available at* www.responsiblelending.org/-mortgage-lending/research-analysis/*Lost-Ground-2011*.pdf).

[20] *Id.*

[21] *See* Abt Associates, *Using Credit Scores to Analyze High-Cost Lending in Central City Neighborhoods* (2008); Center for Responsible Lending, *Lost Ground, 2011:  Disparities in Mortgage Lending and Foreclosures* (2011) (*available at* www.-responsiblelending.org/mortgage-lending/research-analysis/*Lost-Ground-2011*.pdf); Center for Responsible Lending, *Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages* (2006) (*available at*

80.    In general, as recently observed by the Federal Reserve in December 2012, both African-American and Hispanic borrowers were far more likely (in fact, nearly twice more likely) to obtain higher-priced loans than were white borrowers. These relationships hold both for home-purchase and refinance lending and for non-conventional loans.  These differences are reduced, but not eliminated, after controlling for lender and borrower characteristics.  "Over the years, analyses of HMDA data have consistently found substantial differences in the incidence of higher-priced lending across racial and ethnic lines, differences that cannot be fully explained by factors included in the HMDA data."[22]

81.    African-Americans and Hispanics were much more likely to receive subprime loans and loans with features that are associated with higher foreclosures, specifically prepayment penalties and hybrid or option ARMs.  These disparities were evident even comparing borrowers within the same credit score ranges.  In fact, the disparities were especially pronounced for borrowers with higher credit scores.  For example, among borrowers with a FICO score of over 660 (indicating good credit), African-Americans and Latinos received a high interest rate loan more than three times as often as white borrowers.[23]

82.    In addition to receiving a higher proportion of higher-rate loans, African-Americans and Latinos also were much more likely to receive loans with other risky

_____

http://www.responsiblelending.org/mortgage-lending/research-analysis/rr011-*Unfair_Lending-0506*.pdf); Finance and Economics Discussion Series Divisions of Research & Statistics and Monetary Affairs Federal Reserve Board, Washington, D.C, *Subprime Mortgages: What, Where, and to Whom?* (2008) (*available at* http://www.nber.org/papers/w14083.pdf?new_window=1 ); C. Reid and E. Laderman, Federal Reserve Bank of San Francisco, *The Untold Costs of Subprime Lending: Examining the Links among Higher-Priced Lending, Foreclosures and Race in California*, Presented at Brandeis University (2009) (*available at* http://iasp.brandeis.edu/pdfs/Author/reid-carolin/The%20Untold%20Costs%20of%20Subprime%20Lending%203.pdf ).

[22] Federal Reserve Bulletin, *The Mortgage Market in 2011: Highlights from the Data Reported under the Home Mortgage Disclosure Act* (Dec. 2012) (*available at* http://www.federalreserve.gov/pubs/bulletin/2012/PDF/2011_HMDA.pdf).

[23] Center for Responsible Lending, *Lost Ground, 2011, supra* n.19.

features, such as hybrid and option ARMs and prepayment penalties.  Disparities in the incidence of these features are evident across all segments of the credit spectrum.

83.    At the same time that conventional credit has contracted over the past five years, FHA lending has expanded dramatically.  During the subprime boom, FHA lending fell as subprime lenders targeted minority communities.  Now, with little or no subprime lending, and conventional credit restricted, FHA lending has shot up. Overall, the share of loans with government backing went from 5% in 2005 to 26.6% in 2010.[24]

84.    For African-Americans, the share of mortgages used to purchase a home and backed by a government program increased to almost 80% in 2010; for Latinos the share increased to 73%.  But for whites, the share increased to only 49%.  At present, most minority borrowers cannot gain access to the conventional mortgage market, and instead, are relegated to more expensive FHA loans.[25]  As discussed above, these government loans often have higher interest, fees, and costs than conventional loans.

### 3.    Statistical analyses conducted by the United States Department of Justice of data for loans originated by Wells Fargo showed a disparate impact on minority borrowers.

#### a.    Minority borrowers were more likely than whites to receive subprime loans.

85.    Statistical analyses conducted by the United States Department of Justice of loan data for prime and subprime wholesale loans originated by Wells Fargo just for the time period of 2004 to 2008 demonstrate that, measured on a nationwide basis after controlling for major risk-based factors relevant to determining loan product placement, including credit history, LTV, and DTI, African-American and Hispanic borrowers remained more likely to receive subprime loans from 2004 to 2008 than similarly-situated whites.  This demonstrates a pattern of statistically significant

---

[24] Center for Responsible Lending, *supra*, n.8.

[25] *Id.*

differences between African-American and white borrowers with respect to their product placement by Wells Fargo.  These statistically significant disparities existed in numerous geographic markets across the nation as well.

86.     For the combined time period of 2004 to 2008, nationwide, the odds that an African-American borrower who obtained a wholesale loan from Wells Fargo would receive a subprime loan rather than a prime loan were approximately 2.9 times as high as the odds for a similarly situated white borrower, after accounting for the same factors.  For the same time period, the odds that an African-American borrower who obtained a retail loan from Wells Fargo would receive a subprime loan rather than a prime loan were approximately 2.0 times as high as the odds for a similarly-situated white borrower, after accounting for the same factors.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers with respect to their product placement by Wells Fargo, even after accounting for objective credit qualifications.

87.     For the combined time period of 2004 to 2008, nationwide, the odds that a Hispanic borrower who obtained a wholesale loan from Wells Fargo would receive a subprime loan instead of a prime loan were approximately 1.8 times as high as the odds for a similarly-situated white borrower, after accounting for the same factors.  During the same time period, the odds that a Hispanic borrower would receive a subprime retail loan rather than a prime retail loan wore approximately 1.3 times as high as the odds for a similarly-situated white borrower, after accounting for the same factors.  These odds ratios demonstrate a pattern of statistically significant differences between Hispanic and white borrowers with respect to their product placement by Wells Fargo, even after accounting for objective credit qualifications.

88.     The disparate placement of both African-Americans and Hispanic borrowers whom Wells Fargo determined had the credit characteristics to qualify for a home mortgage loan into subprime loan products, when compared to similarly-situated

white borrowers, resulted from the implementation and interaction of Wells Fargo's policies and practices that: (a) permitted Wells Fargo subprime loan originators to place an applicant in a subprime loan product even if the applicant could qualify for a prime loan product; (b) provided a financial incentive to Wells Fargo subprime loan originators to place loan applicants in subprime loan products; (c) did not require Wells Fargo subprime loan originators to justify or document the reasons for placing an applicant in a subprime loan product even if the applicant could qualify for a prime loan product; (d) did not require Wells Fargo subprime loan originators to notify subprime loan applicants when they did in fact qualify for a more favorable loan product; and (e) failed to monitor these discretionary practices to ensure that borrowers were being placed in loan products on a nondiscriminatory basis.

89.     Wells Fargo's policies or practices were not justified by business necessity or legitimate business interests. There were less discriminatory alternatives available to Wells Fargo that would have achieved the same business goals as these policies and practices.

90.     As early as 2005, Wells Fargo's senior officers had knowledge that its lending policies and practices resulted in the placement of prime-qualified minority applicants in subprime rather than prime loan products and that its A-Paper Filter was ineffective. For example, an internal Wells Fargo document from 2005 sent from a Wells Fargo Vice President of Retail Underwriting, National Programs to a number of senior and executive vice presidents revealed concerns about A-Paper Filter manipulation and listed various tactics that subprime originators routinely employed to keep loans in the subprime division, rather than sending them to the prime channel. Another internal Wells Fargo document from 2005 concluded that loans were being originated as subprime, even though the borrowers had prime characteristics. Nonetheless, Wells Fargo continued to implement those policies and practices and did not take effective action to change the discriminatory policies or practices to eliminate

their discriminatory impact.  Nor did it act to identify or compensate the individual borrowers who were victims of its discriminatory product placement policies or practices.

> **b.      Minority borrowers were more likely than white borrowers to pay higher broker fees and costs.**

91.      Statistical analyses of data kept by Wells Fargo on its wholesale loans between 2004 and 2008 demonstrate statistically significant discriminatory pricing disparities in both prime and subprime loans based on both race (African-American) and national origin (Hispanic).  These disparities existed both at the national level and in numerous geographic markets across the country.

92.      Measured on a nationwide basis in each year between 2004 and 2008, Wells Fargo charged African-American borrowers whom Wells Fargo determined had the credit characteristics to qualify for a home mortgage loan more in total broker fees for prime wholesale loans than white borrowers.  The annual total broker fee disparities ranged up to 78 basis points, and they are statistically significant.

93.      Measured on a nationwide basis, in each year between 2004 and 2008, Wells Fargo charged Hispanic borrowers whom Wells Fargo determined had the credit characteristics to qualify for a home mortgage loan more in total broker fees for prime wholesale loans than white borrowers.  The annual total broker fee disparities ranged up to 55 basis points, and they are statistically significant.

94.      Measured on a nationwide basis in each year between 2004 and 2007, Wells Fargo charged African-American borrowers whom Wells Fargo determined had the credit characteristics to qualify for a home mortgage loan more in total broker fees for subprime wholesale loans than white borrowers.  The annual total broker fee disparities ranged up to 53 basis points, and they are statistically significant.

95.      In setting the terms and conditions for its wholesale loans, including interest rates, Wells Fargo accounted for individual borrowers' differences in credit risk characteristics by setting the prices shown on its rate sheets for each loan product

for borrowers with specified credit qualifications.  These adjustments based on credit risk characteristics were separate from and did not control for either component of the total broker fees – the interest rate deviations that Wells Fargo's policy allowed mortgage brokers to make from the par prices, which already fully accounted for borrower risk according to Wells Fargo's own standards, nor the amount of brokers' direct fees that were driven by a borrower's credit risk factors.  The race and national origin total broker fee disparities described above are not adjusted for borrowers' credit risk characteristics; Wells Fargo reviewed these broker fees and then authorized its brokers to charge them to borrowers in the loans it originated and funded.

96.     The statistically significant race and national origin-based disparities in broker fees for African-Americans and Hispanics resulted from the implementation and interaction of Wells Fargo's policies and practices that:  (a) included pricing terms based on the subjective and unguided discretion of brokers in setting broker fees not based on borrower risk in the terms and conditions of loans that Wells Fargo originated after par rates had been established by reference to credit risk characteristics; (b) created a financial incentive for brokers to charge interest rates above the par rates that Wells Fargo had set; (c) did not require mortgage brokers to justify or document the reasons for the amount of broker fees not based on borrower risk; and (d) failed to adequately monitor for and fully remedy the effects of racial and ethnic disparities in those broker fees.  Broker fees specifically measure the pricing variation caused by the subjective and unguided pricing adjustments not based on borrower risk.  Wells Fargo continued to use these discretionary wholesale broker fee pricing policies, to inadequately document and review the implementation of that pricing component, and to incentivize upward broker adjustments to the par interest rate at least through the end of 2008.

97.     Wells Fargo's policies and practices identified above were not justified by business necessity or legitimate business interests.  There were less discriminatory

alternatives available to Wells Fargo that would have achieved the same business goals as these policies and practices.

98.    Wells Fargo had knowledge that the unguided and subjective discretion it granted to mortgage brokers in its wholesale pricing policies and practices was being exercised in a manner that discriminated against African-American and Hispanic borrowers, but continued to implement its policies and practices with that knowledge. Wells Fargo did not take effective action to change the broker fee policies and practices to eliminate fully their discriminatory impact.  Wells Fargo did not act to identify or compensate any individual borrowers who were victims of its discriminatory wholesale pricing policies and practices.

**C.    Wells Fargo Intentionally Discriminated Against Minority Borrowers in Violation of the Fair Housing Act, as Demonstrated by Former Bank Employees**

99.    Confidential Witnesses ("CWs") are former Wells Fargo employees responsible for making and/or underwriting loans on behalf of Wells Fargo in the greater Miami region.  CWs describe how Wells Fargo has targeted minorities and residents of minority neighborhoods in and around Miami for predatory lending practices.

100.    CW1 worked for Wells Fargo in 2010 as a Community Reinvestment Act loan officer based in the Miami area.  He left his employment because he did not agree with how management was encouraging him to put low- to moderate-income borrowers into FHA and Freddie Mac loans that were more expensive than CRA loans.

101.    CW2 worked for Wells Fargo as a loan officer between 2004 and 2005. He worked for two branches in the Miami area.  He dealt exclusively with non-prime loans.

102.    CW3 worked for Wells Fargo as a loan officer between 2000 and 2012. He dealt with loans originating throughout Miami-Dade County and the City of

Miami.  His customer base was largely comprised on lower to middle-income Hispanic borrowers.

103.   CW4 was a Home Mortgage Consultant, Sales Manager and top subprime loan officer at Wells Fargo.  She was invited to participate in a number of sales and marketing meetings with upper-level management.  A number of other loan officer representatives and personnel from around the country attended these meetings as well.  As a result, while she was employed by the Bank in Maryland, she was aware that the Bank's discriminatory lending practices took place nationally.  Similarly, she was aware that the Bank's compensation and pricing policies were applied on a nationwide basis.

### 1.    Wells Fargo targets minorities for predatory loan terms.

104.   The CWs explain that Wells Fargo targeted minorities in Miami in various ways.  One was by targeting its discriminatory lending toward predominantly minority neighborhoods in Miami.

105.   CW1 explained that CRA loans are part of a federal legal framework designed to discourage redlining. According to CW1, management pushed FHA and Freddie Mac loans on low- to mid-income borrowers.  The FHA and Freddie Mac loans were more expensive to borrowers, but they were more profitable to Wells Fargo and easier to sell on the secondary market.  CW1 expressed to management that he wanted to tell these borrowers that there was a better product out there for them, and that he was not in this industry to put people into bad loans.  Management disagreed, responding that "it's about putting food on the table at your home for your family."

106.   CW2 made a point of reaching out to Latinos and African-Americans in marketing non-prime loans in Miami by attending community gatherings at organizations like the Columbian Chamber of Commerce and at an African-American congregation.

107.   According to CW4, Wells Fargo also targeted minority churches and their congregations for subprime loans.  Wells Fargo did not target white churches – "[w]hen it came to marketing, any reference to 'church' or 'churches' was understood as code for African-American or black churches."

108.   Wells Fargo even assigned employees to make presentations at the churches on the basis of race.  During a conference call in 2005 with subprime loan officers and branch managers about making presentations to black churches, the loan officers were told that only employees "of color" could attend, said CW4.  She was later told that she could come, but only if she "carried someone's bag."

109.   Wells Fargo also targeted African-Americans for subprime loans through a variety of special events, according to CW4.  Wells Fargo selected employees to make presentations at these events on the basis of race, as it did with church presentations.  One such event was a "'wealth building' seminar" designed to promote subprime products in 2005, where the audience was expected to be predominantly African-American.  CW4 was told by the manager of Emerging Markets, a subprime unit that targeted African-Americans, that she was "too white" to appear before the audience at the seminar.  She complained to higher management, but received no response and no action was taken.

**2.   Wells Fargo gives its employees discretion to steer people who qualify for conventional mortgages into discriminatory mortgages (and pays its employees more for doing so).**

110.   The CW statements demonstrate that Wells Fargo steered borrowers who qualified for prime loans into subprime loans.

111.   CW2 said that, as a non-prime loan officer, he felt pressured to write a lot of non-prime loans.  His quota was about 8-10 loans a month, depending on the size of the loans.  He would write non-prime loans for borrowers with credit scores up to 700.  The non-prime loans that he wrote had higher rates and fees.

112.    According to CW4, the Bank's commission and fee structure gave A rep loan officers a financial incentive to refer loans to a subprime loan officer.  Her job was to figure out how to get the customer into a subprime loan.  She knew that many of the referrals she received could qualify for a prime loan, and the Bank's underwriting guidelines left ample discretion to figure out how to qualify most referrals for a subprime loan.  Even after Wells Fargo began limiting the amount of loan fees, loan officers still had discretion and a big financial incentive to offer higher-cost loans because doing so increased their commissions.

### 3.    Wells Fargo underwrites adjustable rate loans that borrowers cannot afford.

113.    Wells Fargo frequently originates "3/27" adjustable rate mortgages, and frequently originated "2/28" adjustable rate mortgages until mid-2007, to borrowers from predominantly minority neighborhoods in Miami.  Unless properly underwritten, such loans are destined to fail.

114.    CW3 confirmed that Wells Fargo originated interest-only and adjustable rate mortgages.  He cautioned that some loan officers misled borrowers about the terms of such loans.  For example, he said that a loan officer would tell a borrower that an interest only loan would convert to a fixed rate after the interest only period, when in fact, it would convert to an adjustable rate after the interest only period expired.

115.    Wells Fargo does not properly underwrite these loans when made to minorities and in minority neighborhoods.  Wells Fargo does not adequately consider the borrowers' ability to repay these loans, especially after the teaser rate expires and the interest rate increases.  The fact that these loans would result in delinquency, default, and foreclosure for many borrowers was, or should have been, clearly foreseeable to Wells Fargo at the time the loans were made.

116.    The use of "2/28" and "3/27" adjustable rate mortgages in the manner described above is consistent with the practice of reverse redlining, has subjected minority borrowers to unfair and deceptive loan terms, and has contributed

significantly to the high rate of foreclosure found in the minority neighborhoods of Miami.

      **4.**    **Wells Fargo limits the ability of minority borrowers to refinance out of the same predatory loans that they previously received from the Bank.**

117.    After the market crashed in or around 2008, the Bank's documentation required for approval became "overwhelming," CW3 said. "Minorities had a harder time verifying the documentation," according to CW3, which precluded many of them from refinancing existing loans. CW3 also explained that underwriting became so strict that the Bank questioned things like a $100 cash deposit in bank accounts and routinely rejected a borrower's representation of intent to occupy a property.

118.    CW3 noticed that the Hispanic borrowers' applications he submitted to underwriting seemed to be rejected more than others. "I always said that a Rodriguez in the last name was treated differently than a Smith," he said of loan applications. In two applications with similar scenarios, "the one with Smith would get it and the one with Rodriguez wouldn't."

      **5.**    **Wells Fargo engages in other abusive lending practices.**

119.    The CWs further demonstrate that Wells Fargo loan officers engaged in other abusive lending practices at the expense of minority borrowers.

120.    According to CW2, for customers with less than prime credit scores, management suggested offering non-prime loans in order to give them time to improve their credit and then refinance their loans so the bank would make more fees.

 121.    CW2 further explained that Wells Fargo often changed paperwork that showed which bank branches were originating loans in order to make it appear as if no single branch was solely originating loans from a single ethnic community. "It was common knowledge that, to avoid problems, loans from one office were sent to another office to make both look more balanced. We needed to put some white loans

in that community and some black loans in this community because [otherwise] we'll get some sh#% from the Fed."

122.   CW3 said that, prior to 2008, Wells Fargo sent loan officers out into the community to promote its "no doc" loans, which were also called the "reduced documentation" loans at Wells Fargo. These loans, which carried a higher interest rate than fully documented loans, were frequently promoted to Hispanic borrowers with credit scores above 660.  CW3 believed that other Wells Fargo loan officers had submitted false documents and exaggerated borrowers' incomes to qualify borrowers for loans.  "If a guy told you he made $3000, you'd put in $5000" into the underwriting software program, he said, explaining how it worked.  He said there was no "backstop" system at the Bank to prevent it.  Consequently, loan officers were "putting people in homes that they didn't qualify for," he said. "Obviously, it would put them in a bad predicament."

123.   Further, CW3 said that loan officers sometimes took advantage of low to middle-income Hispanic customers who were not well-educated.  According to CW3, the more affluent and better educated borrower knew to read and understand the terms of their loans, whereas the less affluent and less knowledgeable borrower was easily misled about mortgages.  CW3 added that some loan officers at Wells Fargo did not fully inform borrowers of the financial repercussions of their mortgages.

124.   Further still, CW3 described that, for years after the market crash, the only mortgage loans that the Bank made generally available in the Miami area (other than loans requiring a near perfect financial profile) were FHA loans.

**D.   Minorities in Fact Receive Predatory Loan Terms from Wells Fargo**

125.   As discussed herein, Wells Fargo's *predatory* loans include: high-cost loans (*i.e.*, loans with an interest rate that was at least three percentage points above a federally-established benchmark), subprime loans, interest-only loans, balloon payment loans, loans with prepayment penalties, negative amortization loans, no

documentation loans, and/or ARM loans with teaser rates (*i.e.*, lifetime maximum rate > initial rate + 6%).

126.   Data reported by the Bank and available through public databases shows that in 2004-2012,11.1% of loans made by Wells Fargo to African-American and Latino customers in Miami were high cost, but only3.2% of loans made to white customers in Miami were high cost.[26]   This data demonstrates a pattern of statistically significant differences in the product placement for high cost loans between minority and white borrowers. [27]

127.   The following map of Wells Fargo predatory loans originated in Miami between 2004-2012 illustrates the geographic distribution of predatory loans in African-American and Latino neighborhoods and white neighborhoods in Miami. This map demonstrates that Wells Fargo's predatory loans are disproportionately located in minority neighborhoods.

---

[26] As alleged throughout the complaint, all references to the date range 2004-2012 are intended to include the time period up to and including December 31, 2012.

[27] Statistical significance is a measure of probability that an observed outcome would not have occurred by chance.  As used in this Complaint, an outcome is statistically significant if the probability that it could have occurred by chance is less than 10%.



128.   The fact that predatory loans involving all of Wells Fargo's loan products are more heavily concentrated in minority neighborhoods in Miami is consistent with the practice of reverse redlining and, upon information and belief, has contributed significantly to the disproportionately high rates of foreclosure in minority communities in Miami.

**E.     Minorities in Miami Receive Such Predatory Loan Terms from Wells Fargo Regardless of Creditworthiness**

129.   According to *Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act*, 45 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REV. 375, 398 (2010), several studies dating back to 2000 have established that minority borrowers were charged higher interest rates/fees than similar creditworthy white borrowers.

130.   Likewise, according to *A Racial Financial Crisis*, 83 TEMPLE LAW REV. 941, 947, 949 (2011), one study concluded that "even after controlling for underwriting variables, African-American borrowers were 6.1% to 34.3% more likely than whites to receive a higher rate subprime mortgage during the subprime boom." And another study found that significant loan pricing disparity exists among low risk borrowers – African-American borrowers were 65% more likely to receive a subprime home purchase loan than similar creditworthy white borrowers, and 124% more likely to receive a subprime refinance loan.

131.   Similarly, the Center for Responsible Lending's November 2011 report, *Lost Ground, 2011:  Disparities in Mortgage Lending and Foreclosures,* stated that "racial and ethnic differences in foreclosure rates persist even after accounting for differences in borrower incomes."  Further, the Center stated it is "particularly troublesome" that minorities received riskier loans "even within [similar] credit ranges."  For example, among borrowers having FICO scores above 660, the incidence of higher rate loans among various groups was as follows:  whites – 6.2%; African-American – 21.4%; and Latino – 19.3%.

132.    Moreover, data reported by the Bank and available through both public and private databases shows that minorities in Miami received predatory loan terms from Wells Fargo more frequently than white borrowers regardless of creditworthiness.

133.    A regression analysis of this data controlling for borrower race and objective risk characteristics such as credit history, loan-to-value ratio, and the ratio of loan amount to income demonstrates that, from 2004-2012, an African-American borrower was 4.321 times more likely to receive a predatory loan as a white borrower possessing similar underwriting and borrower characteristics.  The regression analysis further demonstrates that the odds that a Latino borrower would receive a predatory loan was 1.576 times the odds that a white borrower possessing similar underwriting and borrower characteristics would receive a predatory loan.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

134.    The regression analysis also shows that these disparities persist when comparing only borrowers with FICO scores above 660.  An African-American borrower with a FICO score above 660 was 2.572 times more likely to receive a predatory loan as a white borrower with similar underwriting and borrower characteristics.  A Latino borrower with a FICO score above 660 was 1.875 times more likely to receive a predatory loan as a white borrower with similar underwriting and borrower characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

135.    A similar regression analysis taking into account the racial makeup of the borrower's neighborhood rather than the individual borrower's race shows that borrowers in heavily minority neighborhoods in Miami were more likely to receive predatory loans than borrowers in heavily white neighborhoods.  For example, a

borrower in a heavily minority census tract (census tract consisting of at least 90% African-American or Latino households) was 1.955 times more likely as a borrower with similar characteristics in a  non-minority neighborhood  (census tract with at least 50% white households) to receive a predatory loan.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

136.   This data also establishes that Wells Fargo disproportionately issued loans with higher risk features including government loans (FHA/VA) and other high cost loans to African-American and Latino borrowers in Miami from 2008-2012.  A regression analysis controlling for borrower race and objective risk characteristics such as ratio of loan amount to income demonstrates that an African-American borrower was 9.321 times more likely to receive one of these loans with higher  risk features than a white borrower possessing similar borrower and underwriting characteristics.  The regression analysis further demonstrates that a Latino borrower was 3.162 times more likely to receive one of these loans with higher risk features than a white borrower possessing similar borrower and underwriting characteristics. These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

137.   Thus, the disparities are not the result of or otherwise explained by legitimate non-racial underwriting criteria.

**F.     Wells Fargo's Targeting of Minorities who in Fact Receive Predatory Loan Terms Regardless of Creditworthiness Causes Foreclosures**

**1.     Data shows that Wells Fargo's foreclosures are disproportionately located in minority neighborhoods in Miami.**

138.   Wells Fargo's failure to underwrite mortgage loans in minority and underserved communities in a responsible manner has been the subject of public attention and concern for years.  For example, its practices are the focus of a 2004 report from the Center for Responsible Lending.  The report concluded that Wells

Fargo's customers "too often face the loss of their home or financial ruin as a result" of its "predatory practices."[28]  The predatory practices identified in the report include charging excessively high interest rates that are not justified by borrowers' creditworthiness; requiring large prepayment penalties while deliberately misleading borrowers about the penalties; convincing borrowers to refinance mortgages into new loans that only benefit Wells Fargo; deceiving borrowers into believing that they are getting fixed-rate loans when they are really getting adjustable rate loans; charging excessive fees; and more.

139.   Such reports underscore the foreseeability of foreclosures arising from predatory lending practices, and their attendant harm.

140.   Wells Fargo has intentionally targeted these kinds of predatory practices at African-American and Latino neighborhoods and residents.  Far from being a responsible provider of much-needed credit in minority communities, Wells Fargo is a leading cause of stagnation and decline in African-American and Latino neighborhoods where its foreclosures are concentrated.  Specifically, since at least 2000, its foreclosures have been concentrated in neighborhoods with African-American or Latino populations exceeding 75%.

141.   Although  50.5% of Wells Fargo's loan originations in Miami from 2004 to 2012 were in census tracts that are at least 75% African-American or Latino, 63.9% of loan originations that had entered foreclosure by June  2013 were in those census tracts.  Similarly, while  83.3% of Wells Fargo's loan originations in Miami from 2004 to 2012 occurred in census tracts that are at least 50% African-American or Latino, 95.5% of Wells Fargo's loan originations that had entered foreclosure by June  2013 were in those census tracts.  Moreover, while 16.7% of Wells Fargo's loan originations in Miami from 2004 to 2012 occurred in census tracts that were less than

---

[28] Center for Responsible Lending, *A Review of Wells Fargo's Subprime Lending* (Apr. 2004) at 10 (available at http://www.responsiblelending.org/mortgage-lending/research-analysis/ip004-Wells_Fargo-0404.pdf).

50% African-American or Latino, only 4.5% of Wells Fargo's loan originations that has entered foreclosure by June 2013 were in those census tracts. This data demonstrates a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

142.    The following map represents the concentration of Wells Fargo's loan originations from 2004 through 2012 that had entered foreclosure by June 2013 in African-American and Latino neighborhoods.    In addition to the disproportionate distribution of Wells Fargo foreclosures in African-American and Latino neighborhoods, disparate rates of foreclosure based on race further demonstrate Wells Fargo's failure to follow responsible underwriting practices in minority neighborhoods.  While 24.3% of Wells Fargo's loans in predominantly (greater than 90%) African-American or Latino neighborhoods result in foreclosure, the same is true for only 4.4% of its loans in non-minority (at least 50% white) neighborhoods. In other words, a Wells Fargo loan in a predominantly African-American or Latino neighborhood is 6.975 times more likely to result in foreclosure as a Wells Fargo loan in a non-minority neighborhood.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.



% of Occupied Housing Units that are
African-American or Hispanic, 2010

- 90.1% - 100%
- 75.1% - 90%
- 50.1% - 75%
- 50% or Less
- No Occupied Housing Units

Wells Fargo 2004-2012 Loan
Originations that had Entered
Foreclosure as of June 2013
• 1 Dot = 1 Property

143.   Thus, Wells Fargo's discretionary lending policies and pattern or practice of targeting of minorities, who in fact receive predatory loan terms regardless of creditworthiness, have caused and continue to cause foreclosures in Miami.

**2.   Data shows that Wells Fargo's loans to minorities result in especially quick foreclosures.**

144.   A comparison of the time from origination to foreclosure of Wells Fargo's loans originated in Miami from 2004 to 2012 shows a marked disparity with respect to the speed with which loans to African-Americans and Latinos and whites move into foreclosure.  The average time to foreclosure for African- American and Latino borrowers is 2.996 years.   By comparison, the average time to foreclosure for white borrowers is 3.266 years.  These statistically significant disparities demonstrate that Wells Fargo aggressively moved minority borrowers into foreclosure as compared with how the Bank handled foreclosures for white borrowers.

145.   This disparity in time to foreclosure is further evidence that Wells Fargo is engaged in lending practices consistent with reverse redlining.  The disparity in time to foreclosure demonstrates that Wells Fargo is engaged in irresponsible underwriting in African-American and Latino communities that does not serve the best interests of borrowers.  If Wells Fargo were applying the same underwriting practices in African-American and Latino neighborhoods and white neighborhoods in Miami, there would not be a significant difference in time to foreclosure.  Were Wells Fargo underwriting borrowers in both communities with equal care and attention to proper underwriting practices, borrowers in African-American and Latino communities would not find themselves in financial straits significantly sooner during the lives of their loans than borrowers in white communities.  The faster time to foreclosure in African-American and Latino neighborhoods is consistent with underwriting practices in minority communities that are less concerned with determining a borrower's ability to pay and qualifications for the loan than they are in maximizing short-term profit.

146.   The HUD/Treasury Report confirms that time to foreclosure is an important indicator of predatory practices:  "[t]he speed with which the subprime loans in these communities have gone to foreclosure suggests that some lenders may be making mortgage loans to borrowers who did not have the ability to repay those loans at the time of origination."[29]

**3.    Data shows that the discriminatory loan terms cause the foreclosures.**

147.   Wells Fargo's discriminatory lending practices cause foreclosures and vacancies in minority communities in Miami.

148.   Steering borrowers into loans that are less advantageous than loans for which they qualify, including steering borrowers who qualify for prime loans into subprime loans, can cause foreclosures because the borrowers are required to make higher loan payments.  The difference between what a borrower who is steered in this manner must pay and the lower amount for which the borrower qualified can cause the borrower to be unable to make payments on the mortgage.  In such instances, the borrower would have continued to make payments on the mortgage and remained in possession of the premises had Wells Fargo made the loan without improperly steering the borrower into a subprime, or less advantageous loan.  Steering borrowers in this manner, therefore, causes foreclosures and vacancies.

149.   Giving a loan to an applicant who does not qualify for the loan, especially a refinance or home equity loan, can also cause foreclosures and vacancies.  Some homeowners live in properties that they own subject to no mortgage.  Other homeowners live in properties with modest mortgages that they can comfortably afford to pay.  Where a lender, such as Wells Fargo, solicits such a homeowner to take out a home equity loan on their property, or alternatively, to refinance their existing loan into a larger loan without properly underwriting them to assure that they can make the monthly payments for the new, larger loan, the result is likely to be that the

---

[29] HUD/Treasury Report at 25.

borrower will be unable to make payments on the mortgage.  This is particularly true where the borrower is refinanced from a fixed-rate loan into an adjustable rate loan that the lender knows the borrower cannot afford should interest rates rise.  In some instances the lender may refinance the borrower into a new loan that the lender knows the borrower cannot sustain given the borrower's present debt obligations and financial resources.  In such circumstances, the likely result of such practices is to cause homeowners who are otherwise occupying properties without a mortgage, or comfortably making payments on a modest existing mortgage, to be unable to make payment on a new, unaffordable loan.  This, in turn, causes foreclosures and vacancies.  If these unaffordable refinance and home equity loans had not been made, the subject properties would not have become vacant.

150.   A regression analysis of loans issued by Wells Fargo in Miami from 2004-2012 controlling for objective risk characteristics such as credit history, loan to value ratio, and the ratio of loan amount to income demonstrates that a predatory loan is 5.494 times more likely to result in foreclosure than a non-predatory loan.

151.   The regression analysis also demonstrates that a predatory loan made to an African-American borrower was 13.324 times more likely as a non-predatory loan made to a white borrower with similar borrower and underwriting characteristics to result in foreclosure.  A predatory loan made to a Latino borrower was 17.341 times more likely as a non-predatory loan made to a white borrower with similar risk characteristics to result in foreclosure.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

152.   A regression analysis of  loans with higher risk features including government loans (FHA/VA) and other high cost loans  issued by Wells Fargo in Miami from 2008-2012 controlling for borrower race and objective risk characteristics such as ratio of loan amount to income demonstrates that these loans are 1.620 times

more likely as loans without these higher risk features  to result in foreclosure.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

## VI.   INJURY TO MIAMI CAUSED BY WELLS FARGO'S DISCRIMINATORY LOAN PRACTICES

153.   Miami has suffered financial injuries as a direct result of Wells Fargo's pattern or practice of reverse redlining and the resulting disproportionately high rate of foreclosure on Wells Fargo loans to African-Americans and Latinos in minority neighborhoods in Miami.  Miami seeks redress for these injuries.  The City does not seek redress in this action for injuries resulting from foreclosures on mortgages originated by lenders other than Wells Fargo.

154.   Wells Fargo continues to engage in the discriminatory pattern or practice described herein with similar and continuing deleterious consequences to the City.

155.   The City seeks damages based on reduced property tax revenues due to (a) the decreased value of the vacant properties themselves, and (b) the decreased value of properties surrounding the vacant properties.  In addition, the City seeks damages based on municipal services that it provided and still must provide to remedy blight and unsafe and dangerous conditions which exist at properties that were foreclosed as a result of Wells Fargo's illegal lending practices.

## A.   Miami has been Injured by a Reduction in Property Tax Revenues from Foreclosures Caused by Discriminatory Loans Issued by Wells Fargo

156.   When a home falls into foreclosure, it affects the property value of the foreclosed home as well as the values of other homes in the neighborhood.  These decreased property values in turn reduce property tax revenues to the City.

157.   As property values drop, Miami communities could lose many millions in property tax revenues from the decreased value of the foreclosed homes themselves and those in the surrounding neighborhoods.

1.      **The decreased value of the properties foreclosed by Wells Fargo result in reduced property tax revenues.**

158.   Homes in foreclosure tend to experience a substantial decline in value (e.g., 28%).[30]

159.   A portion of this lost home value is attributable to homes foreclosed as a result of Wells Fargo's discriminatory loan practices.

160.   The decreased property values of foreclosed homes in turn reduce property tax revenues to the City and constitute damages suffered by Miami.

2.      **The decreased value of properties in the neighborhoods surrounding foreclosed properties results in reduced property tax revenues.**

161.   Wells Fargo foreclosure properties and the problems associated with them likewise cause especially significant declines in surrounding property values because the neighborhoods become less desirable.  This in turn reduces the property tax revenues collected by Miami.

162.   Property tax losses suffered by Miami as a result of vacancies resulting from Wells Fargo's foreclosures are fully capable of empirical quantification.

163.   Routinely maintained property tax and other data allow for the precise calculation of the property tax revenues lost by the City as a direct result of particular Wells Fargo foreclosures.  Using a well-established statistical regression technique that focuses on effects on neighboring properties, the City can isolate the lost property value attributable to Wells Fargo foreclosures and vacancies from losses attributable to other causes, such as neighborhood conditions.  This technique, known as Hedonic regression, when applied to housing markets, isolates the factors that contribute to the value of a property by studying thousands of housing transactions.  Those factors include the size of a home, the number of bedrooms and bathrooms, whether the neighborhood is safe, whether neighboring properties are well-maintained, and more.

---

[30] Campbell, John Y., Stefano Giglio, and Parag Pathak, National Bureau of Economic Research, NBER Working Paper Series, "*Forced Sales and House Prices*" (2009) (*available at* http://www.nber.org/papers/w14866.pdf?new_window=1).

Hedonic analysis determines the contribution of each of these house and neighborhood characteristics to the value of a home.

164.   The number of foreclosures in a neighborhood is one of the neighborhood traits that Hedonic analysis can examine.  Hedonic analysis allows for the calculation of the impact on a property's value of the first foreclosure in close proximity (*e.g.*, ⅛ or ¼ of a mile), the average impact of subsequent foreclosures, and the impact of the last foreclosure.

165.   Foreclosures attributable to Wells Fargo in minority neighborhoods in Miami can be analyzed through Hedonic regression to calculate the resulting loss in the property values of nearby homes.  This loss can be distinguished from any loss attributable to non-Wells Fargo foreclosures or other causes.  The loss in property value in minority neighborhoods in Miami attributable to Wells Fargo's unlawful acts and consequent foreclosures can be used to calculate the City's corresponding loss in property tax revenues.

166.   Various studies establish that Hedonic regression can be used for this purpose.  A study published by the Fannie Mae Foundation, using Chicago as an example, determined that each foreclosure is responsible for an average decline of approximately 1.1% in the value of each single-family home within an eighth of a mile.[31]

167.   Other studies have focused on the impact of abandoned homes on surrounding property values.  A study in Philadelphia, for example, found that each home within 150 feet of an abandoned home declined in value by an average of $7,627; homes within 150 to 299 feet declined in value by $6,810; and homes within 300 to 449 feet declined in value by $3,542.[32]

---

[31] *See* Dan Immergluck & Geoff Smith, *The External Costs of Foreclosure: The Impact of Single-Family Mortgage Foreclosures on Property Values*, 17 Housing Policy Debate 57 (2006) at 69.

[32] *See* Anne B. Shlay & Gordon Whitman, *Research for Democracy: Linking Community Organizing and Research to Leverage Blight Policy*, at 21 (2004).

168.   These studies highlight the foreseeability of tax related harm to the City as the result of foreclosures arising from discriminatory loans.

169.   And most recently, a Los Angeles study reported, "[i]t is conservatively estimated that each foreclosed property will cause the value of neighboring homes within an eighth of a mile to drop 0.9%." Thus, "[i]n Miami, impacted homeowners could experience property devaluation of $53 billion."[33] This decreased property value of neighboring homes in turn reduces property tax revenues to the City.

170.   Application of such Hedonic regression methodology to data regularly maintained by Miami can be used to quantify precisely the property tax injury to the City caused by Wells Fargo's discriminatory lending practices and resulting foreclosures in minority neighborhoods.

**B.   Miami Is Injured Because It Provided and Still Must Provide Costly Municipal Services for Foreclosure Properties in Minority Neighborhoods as a Direct Result of Discriminatory Loans Originated or Purchased by Wells Fargo**

171.   Wells Fargo foreclosure properties cause direct costs to the City because the City is required to provide increased municipal services at these properties.  These services would not have been necessary if the properties had not been foreclosed upon.

172.   For example, the City's Police Department has sent, and will continue to send personnel and police vehicles to Wells Fargo foreclosure properties to respond to a variety of problems, including increased vagrancy, criminal activity, and threats to public health and safety that arise at these properties because of their foreclosure status.  Because violent crime has generally been found to increase due to foreclosures,  the Miami PD must respond to calls reporting suspicious activity at foreclosure properties  and perform ongoing investigations involving criminal activity, including gang activity, at these properties.

---

[33] The Alliance of Californians for Community Empowerment and the California Reinvestment Coalition, *The Wall Street Wrecking Ball:  What Foreclosures are Costing Los Angeles Neighborhoods,* at 3 (2011) ("Cost to Los Angeles Report").

173.   Likewise, the Miami Fire Department has sent, and will continue to send personnel and resources to Wells Fargo foreclosure properties to respond to a variety of fire-related problems that arise at these properties because of their foreclosure status.

174.   The Miami Building Department and Code Enforcement/Code Compliance Departments have devoted, and will continue to devote personnel time and out-of-pocket funds to perform a number of tasks that arise at these properties because of their foreclosure status.  These include, but are not limited to the following: (a) inspect and issue permitting violations in contravention of Florida statutes 553 and the Florida Building Code; (b) inspect and issue violations of the Miami City Code and Florida statutes 162; (c) condemn and demolish vacant structures deemed an imminent hazard to public safety.

175.   The City frequently hires independent contractors to perform certain services, including, but not limited to, (i) removing excess vegetation at vacant properties, (ii) hauling away trash and debris at vacant properties, (iii) boarding vacant property from casual entry, (iv) putting up fencing to secure vacant properties, (v) painting and removing graffiti at vacant properties.  Occasionally, some of these services are performed by the City's General Services Administration Department.  .

176.   The Miami City Attorney's Office has devoted, and will continue to devote personnel time and out-of-pocket resources perform a number of tasks that arise at these properties because of their foreclosure status.  These include, but are not limited to the following: (a) prosecuting code enforcement cases; (b) preserving the City's lien rights at judicial foreclosure proceedings; and (c) pursuing court ordered injunctions involving a myriad of potential problems at foreclosure properties.

177.   The City is required to administer and fund the Unsafe Structures Board, which was formerly under the jurisdiction of Miami-Dade County.

178.   As stated by the *Cost to Los Angeles* Report, "[l]ocal government agencies have to spend money and staff time on blighted foreclosed properties, providing maintenance, inspections, trash removal, increased public safety calls, and other code enforcement services …. Responding to these needs is a gargantuan task that involves multiple agencies and multiple levels of local government."[34]

179.   Moreover, as discussed above, the Apgar-Duda report underscores the foreseeability of municipal costs as the result of foreclosures arising from discriminatory loans.

## VII.   SAMPLE FORECLOSURE PROPERTIES IN THE CITY OF MIAMI

180.   Plaintiff has preliminarily identified nine hundred and ninety-nine (999) discriminatory loans issued by Wells Fargo in Miami between 2004-2012 that resulted in foreclosure.[35]  The City has already incurred, or will incur in the future, damages corresponding to each of these properties.  A sample of property addresses corresponding to these foreclosures is set forth below:

> 4780 NW 5th St., 33126
>
> 2779 NW 4th Terrace, 33125
>
> 744 NW 23rd Ave., 33125
>
> 1153 NW 32nd Pl., 33125
>
> 3268 NW 19th St., 33125
>
> 170 NW 46th St., 33127
>
> 230 SW 30th Ave., 33135
>
> 1928 SW 17th St., 33145

---

[34] *Id.*

[35] Plaintiff anticipates that it will be able to identify more foreclosures resulting from the issuance of discriminatory loans during this time period with the benefit of discovery.  This conclusion derives from the fact that because of certain reporting limitations, the publicly available mortgage loan databases utilized by Plaintiff are not as comprehensive as the mortgage loan databases maintained by and in the possession of an issuing bank.

1246 NW 71st. St., 33147

7631 NW 2nd. Ct., 33150

## VIII.  STATUTE OF LIMITATIONS AND CONTINUING VIOLATIONS DOCTRINE

181.   As alleged herein, Defendant Wells Fargo has engaged in a continuous pattern and practice of mortgage discrimination in Miami since at least 2004 by imposing different terms or conditions on a discriminatory and legally prohibited basis.  In order to maximize profits at the expense of the City of Miami and minority borrowers, Wells Fargo adapted its unlawful discrimination to changing market conditions. This unlawful pattern and practice conduct is continuing through the present and has not terminated. Therefore, the operative statute of limitations governing actions brought pursuant to the Federal Fair Housing Act has not commenced to run.

## IX.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (Violation of the Federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*)

182.   Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

183.   Wells Fargo's acts, policies, and practices as described constitute intentional discrimination on the basis of race.  Wells Fargo has intentionally targeted residents of predominantly African-American and Latino neighborhoods in Miami for different treatment than residents of predominantly white neighborhoods in Miami with respect to mortgage lending.  Wells Fargo has intentionally targeted residents of these neighborhoods for high-cost loans without regard to their credit qualifications and without regard to whether they qualify for more advantageous loans, including prime loans.  Wells Fargo has intentionally targeted residents of these neighborhoods for increased interest rates, points, and fees, and for other disadvantageous loan terms

including, but not limited to, adjustable rates, prepayment penalties, and balloon payments.  Wells Fargo has intentionally targeted residents of these neighborhoods for unfair and deceptive lending practices in connection with marketing and underwriting mortgage loans.

184.   Wells Fargo's acts, policies, and practices have had an adverse and disproportionate impact on African-Americans and Latinos and residents of predominantly African-American and Latino neighborhoods in Miami as compared to similarly situated whites and residents of predominantly white neighborhoods in Miami.  This adverse and disproportionate impact is the direct result of Wells Fargo's policies of providing  discretion to loan officers and others responsible for mortgage lending; failing to monitor this discretion to ensure that borrowers were being placed in loan products on a nondiscriminatory basis when Wells Fargo had notice of widespread product placement disparities based on race and national origin; giving loan officers and others responsible for mortgage lending large financial incentives to issue loans to African-Americans and Latinos that are costlier than better loans for which they qualify; otherwise encouraging and directing loan officers and others responsible for mortgage lending to steer borrowers  into high-cost loans or loans with adjustable rates, prepayment penalties, or balloon payments without regard for whether they qualify for better loans, including but not limited to prime loans; and setting interest rate caps.  These policies have caused African-Americans and Latinos and residents of predominantly African-American and Latino neighborhoods in Miami to receive mortgage loans from Wells Fargo that have materially less favorable terms than mortgage loans given by Wells Fargo to similarly situated whites and residents of predominantly white neighborhoods in Miami, and that are materially more likely to result in foreclosure.

185.   Wells Fargo's residential lending-related acts, policies, and practices constitute reverse redlining and violate the Fair Housing Act as:

(a)    Discrimination on the basis of race and national origin in making available, or in the terms and conditions of, residential real estate-related transactions, in violation of 42 U.S.C. § 3605(a); and

(b)    Discrimination on the basis of race and national origin in the terms, conditions, or privileges of sale of a dwelling, in violation of 42 U.S.C. § 3604(b).

186.   Wells Fargo's policies or practices are not justified by business necessity or legitimate business interests.

187.   Wells Fargo's policies and practices are continuing.

188.   The City is an aggrieved person as defined by 42 U.S.C. § 3602(i) and has suffered damages as a result of Wells Fargo's conduct.

189.   The City's damages include lost tax revenues and the need to provide increased municipal services.  The loss of tax revenues at specific foreclosure sites and at closely neighboring properties in predominantly minority neighborhoods of the City was a foreseeable consequence that was fairly traceable to Wells Fargo's discriminatory lending.  Likewise, the need to provide increased municipal services at blighted foreclosure sites in predominantly minority neighborhoods of the City was a foreseeable consequence that was fairly traceable to Wells Fargo's discriminatory lending.

190.   Wells Fargo's policies and practices, as described herein, had the purpose and effect of discriminating on the basis of race or national origin.  These policies and practices were intentional, willful, or implemented with reckless disregard for the rights of African-American and Latino borrowers.

## SECOND CLAIM FOR RELIEF

### (Common Law Claim For Unjust Enrichment Based On Florida Law)

191.   Plaintiff repeats and incorporates by reference paragraphs 1 - 181 as if fully set forth herein.

192.   Defendants have received and utilized benefits derived from a variety of municipal services, including police and fire protection, as well as zoning ordinances, tax laws, and other laws and services that have enabled Defendants to operate and profit within the City of Miami.

193.   Defendants are aware of and have taken advantage of the services and laws provided by the City of Miami to further their businesses.

194.   As a direct and proximate result of Defendants' predatory lending practices, Defendants have been enriched at the City's expense by utilizing benefits conferred by the City and, rather than engaging in lawful lending practices, practicing unlawful lending practices that have both denied the City revenues it had properly expected through property and other tax payments and by costing the City additional monies for services it would not have had to provide in the neighborhoods affected by foreclosures due to predatory lending, absent the Defendants' unlawful activities.  Defendants have failed to remit those wrongfully obtained benefits or reimburse the City for its costs improperly caused by Defendants, and retention of the benefits by Defendants would be unjust without payment.

195.   In addition, to its detriment the City has paid for the Defendants' externalities or Defendants' costs of harm caused by its mortgage lending discrimination, in circumstances where Defendants are and have been aware of this obvious benefit and retention of such benefit would be unjust.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), the City demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the City respectfully prays that the Court grant it the following relief:

A.     Enter a declaratory judgment that the foregoing acts, policies, and practices of Wells Fargo violate 42 U.S.C. §§ 3604 and 3605;

B.     Enter a permanent injunction enjoining Wells Fargo and its directors, officers, agents, and employees from continuing the discriminatory conduct described herein, and directing Wells Fargo and its directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the discriminatory conduct described herein, and to prevent additional instances of such conduct or similar conduct from occurring in the future, pursuant to 42 U.S.C. § 3613(c)(1);

C.     Award compensatory damages to the City in an amount to be determined by the jury that would fully compensate the City of Miami for its injuries caused by the conduct of Wells Fargo alleged herein, pursuant to 42 U.S.C. § 3613(c)(1);

D.     Award punitive damages to the City in an amount to be determined by the jury that would punish Wells Fargo for the willful, wanton, and reckless conduct alleged herein, and that would effectively deter similar conduct in the future, pursuant to 42 U.S.C. § 3613(c)(1);

E.     Award the City its reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 3613(c)(2);

F.     Require payment of pre-judgment interest on monetary damages; and

G.     Order such other relief as this Court deems just and equitable.

Dated: December 13, 2013                         Respectfully submitted,

By: s/ Lance A. Harke, P.A.
Lance A. Harke, P.A.
Florida Bar No. 863599
HARKE CLASBY & BUSHMAN LLP
9699 N.E. Second Avenue
Miami, FL 33138
Telephone: 305-536-8220
lharke@harkeclasby.com

Victoria Méndez
Florida Bar No. 194931
CITY OF MIAMI
OFFICE OF THE CITY ATTORNEY
444 S.W. 2nd Avenue, Suite 945
Miami, FL 33130
Telephone:  305-416-1800
vmendez@miamigov.com

Steve W. Berman (*pro hac vice* forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
steve@hbsslaw.com

Elaine T. Byszewski (*pro hac vice* forthcoming)
Lee M. Gordon (*pro hac vice* forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA  91101
Telephone:  (213) 330-7150
elaine@hbsslaw.com
lee@hbsslaw.com

Erwin Chemerinsky (*pro hac vice* forthcoming)
UNIVERSITY OF CALIFORNIA, IRVINE
401 East Peltason Drive, Educ. 1095
Irvine, CA  92697
Telephone:  (949) 824-7722
echemerinsky@law.uci.edu

Joel Liberson (*pro hac vice* forthcoming)
Howard Liberson (*pro hac vice* forthcoming)
TRIAL & APPELLATE RESOURCES, P.C.
400 Continental Blvd., 6th Floor
El Segundo, CA  90245
Telephone:  (310) 426-2361
joel@taresources.com
howard@taresources.com

Robert Peck (*pro hac vice* forthcoming)
CENTER FOR CONSTITUTIONAL LITIGATION
777 6th Street NW, Suite 520
Washington, DC  20001
Telephone:  (202) 944-2803
Robert.peck@cclfirm.com

*Attorneys for Plaintiff the City of Miami*